1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JULIAN DELMORE,

                    Plaintiff,

         v.

WASHINGTON STATE DEPARTMENT
OF CORRECTIONS; LISA FLYNN,

                    Defendant.

Case No. 3:21-cv-05625-TMC

ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT AND
MOTION TO STRIKE DEFENSES

## I.    INTRODUCTION

Julian Delmore, a Black former employee of Larch Corrections Center ("Larch"), asserts

claims of race discrimination and retaliation against the Washington State Department of

Corrections ("DOC") and then-Superintendent of Larch, Lisa Flynn.[1] Plaintiff alleges that he

was treated differently than his white colleagues or otherwise subjected to discrimination during

an investigation of a December 2016 event; that his employment was terminated in September

2017 because of his race; and that defendants initiated a criminal referral in December 2017 in

retaliation for his protected activity, in violation of 42 U.S.C. §§ 1981 and 1983.

---

[1] During the events at issue in this case, Lisa Flynn was known as "Lisa Oliver-Estes." *See*
Dkt. 42 ¶ 4. The Court refers to her in this Order as "Lisa Flynn" or "Flynn."

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE DEFENSES - 1

Before the Court is Defendants' motion for summary judgment on all claims, Dkt. 39, Delmore's partial motion for summary judgment on his retaliation claim, Dkt. 71, and Delmore's motion to dismiss DOC's defenses or in the alternative, motion for leave to amend his complaint, Dkt. 83. Having considered the parties' briefing and the relevant record, the Court GRANTS Defendants' motion for summary judgment (Dkt. 39) and DISMISSES Delmore's claims with prejudice. Delmore's cross-motion for partial summary judgment (Dkt. 71) is DENIED as moot. Delmore's motion to dismiss DOC's defenses or in the alternative, motion for leave to amend his complaint (Dkt. 83) is also DENIED as moot.

## II.    BACKGROUND

### A.    Delmore is hired at Larch.

DOC hired Delmore to begin working in 2012 as an On-Call Corrections and Custody Officer 1 ("CO1") at Larch, a minimum-security prison in Yacolt, Washington. Dkt. 41-1 at 2. At the time of the incidents giving rise to this lawsuit, Delmore was a Correctional Officer 2 ("CO2"). *See* Dkt. 42 ¶ 12. Delmore's primary responsibilities involved the custody of incarcerated individuals and the security of the facility, including preventing and detecting contraband and conducting inspections and searches. Dkt. 42 ¶¶ 8, 12. Delmore's performance reviews before the incidents at issue showed he met or exceeded expectations. *See* Dkt. 48-1 at 84–87.

Flynn was the Superintendent at Larch during the events at issue, the facility's highest-ranking official. Dkt. 41 ¶ 3. As Larch's "appointing authority," Flynn was responsible for hiring, firing, and other disciplinary decisions. *Id*. "[B]efore, during, and after Flynn's administration," Larch "was the subject of rumors about racial disharmony. *Id.*; *see also* Dkt. 48-1 at 222–24 (letter from the Vancouver chapters of Black Lives Matter, NAACP, and the USDA Coalition of Minority Employees to Governor Jay Inslee in June 2016 alleging "racist" and

"discriminatory" employment practices at Larch). Within one year of the events that give rise to this lawsuit, Larch was subject to an internal investigation into allegations from a Black employee who "alleged unfair hiring promotion and training opportunities," Dkt. 48-1 at 144–46, and a voluntary "cultural assessment" by the National Institute of Corrections ("NIC") listing "allegations of institutional racism," and "discriminatory hiring practices" as areas of concern, *id.* at 143.

**B.     December 2, 2016 incident and launch of investigations.**

On December 2, 2016, Delmore was the officer assigned to the downstairs, "C tier" housing area of the Silver Star living unit, one of two living units at Larch. Dkt. 40–2 at 13–15. According to Delmore, he saw inmate Perry Anderson enter the nearby office of Correction Unit Supervisor ("CUS") Richard Johnston and "pick something that looked like a kite[2] off the floor and hand it to CUS Johnston." Dkt. 42-2 at 80. Delmore "then heard CUS Johnston talking and heard something mentioned about a knife." *Id.* When Delmore did not receive an order to search for the knife from CUS Johnston, a superior three steps above him in the Larch hierarchy, Dkt. 42 ¶¶ 15, 18, he "called Offender Anderson back to the duty station [and] asked him what the CUS had said about a knife." Dkt. 42-2 at 80. According to Delmore, "Anderson said that he heard CUS Johnston say there was a knife under the mattress of SSU C14L . . . [and] that he saw CUS Johnston tear up the kite and put it in a box." *Id.*; Dkt. 42 ¶ 16. After attempting and failing to locate his direct supervisor, Sergeant Jerrod Leckie, Delmore approached Sergeant James Langenbach and together they reported the events to their superior, Correction Program Manager ("CPM") James Miller. Dkt. 42-2 at 80; Dkt. 40-2 at 28–30. Miller directed Delmore and Langenbach to search the unit. Dkt. 42-2 at 80; Dkt. 40-2 at 31. Delmore, Leckie, and two other

---

[2] A kite is a note that is a common form of written communication at correctional facilities like Larch. Dkt. 39 at 3; Dkt. 47 at 2.

correctional officers then searched each cell until Delmore "found a 'shank' under the mattress" of SSU C14L. Dkt. 42-2 at 80. The shank appeared to be fashioned from half a pair of scissors. Dkt. 40-1 at 43. The bunk where the shank was located belonged to Ronald Lagesse. Dkt. 48-1 at 199. Following the shank's discovery, Lagesse was transferred into Larch's Secured Housing Unit and infracted for having a dangerous weapon in his possession. Dkt. 40-1 at 48.

Flynn ordered "just cause" investigations into the incident over the next month. Dkt. 40-1 at 8; Dkt. 42 ¶¶ 17–19. Although Flynn was ultimately responsible for initiating investigations into security breaches at Larch, she consulted with Larch Human Resources and her supervisor on whether the information available supported an investigation. Dkt. 40-1 at 8; Dkt. 41 ¶ 3. On December 6, 2016, Flynn launched an investigation into Johnston based on Delmore's allegation that he destroyed the kite and took no action regarding the potential knife in the facility. Dkt. 42 ¶¶ 16–18; Dkt. 42-1 at 7–8. In addition to Johnston admitting that he tore up the kite, DOC's Workplace Investigations Services unit found in Johnston's office old evidence bags containing contraband such as tobacco products, pornographic magazines, and other unauthorized items such as a steak knife he allegedly used as silverware. Dkt. 42 ¶ 18; Dkt. 42-1 at 10, 12. Following the investigation, Johnston was demoted three steps: from a CUS, one of the highest-ranking positions at Larch, to a CO2. Dkt. 42 ¶ 18; Dkt. 42-1 at 17.

On December 19, 2016, Flynn ordered a second fact-finding investigation into the incident, this time into allegations that Delmore made and planted the shank. Dkt. 40–1 at 26; Dkt. 42 ¶ 19; Dkt. 42-2 at 38–39. In the weeks between the December 2 incident and launching the investigation into Delmore on December 19, "multiple pieces [of evidence] . . . came in that caused great alarm" to Flynn. *See* Dkt. 40-1 at 27.

On December 9, an anonymous inmate complaint accused "Sgt. Lucky & Officer [] Delmar" of "plant[ing] the (scissors) 'shank' on C-Tier (#14) . . . and contriv[ing] the

[a]nonymous 'kite[.]'" Dkt. 42-2 at 84. Then on December 16, letters from three named inmates and one anonymous inmate were mailed in the same envelope to DOC and received on December 22. Dkt. 42-2 at 14–15, 85–99. The cover letter, written by Lucas Osborne, stated that Lagesse and Johnston "were conspired against" and that the "staff who we all believe . . . are involved" are "Sgt. Leckie, Ofc. Delmore, and Ofc. Bergstrom." *Id.* at 85. The cover letter requested an unbiased investigation into the incident. *Id.* at 86. The investigative report would later characterize many of the allegations in the letters as containing "no first-hand information." *Id.* at 15. However, the letters did include a first-hand account from inmate Douglas White that on December 2, he "overheard Delmar at the lower front duty desk say, 'I want that motherfucker in C-14 gone.'" *Id.* at 91.

Incident reports submitted by CO2 Nick McKinney on December 15 and 16 also raised suspicions about Delmore's involvement. McKinney wrote that on December 2, before the events giving rise to this suit, he was working in the recreation office when Delmore came in and asked to borrow a hammer from the tool cage. *Id.* at 106, 16. Delmore did not tell McKinney why he wanted a hammer when asked, and after McKinney asked a second time, "he said to trust him that I don't want to know." *Id.* at 106. McKinney handed him the hammer despite his "very strange" behavior. *Id.* Delmore proceeded to the recreation office's employee bathroom and McKinney "heard a bang and what sounded like pieces of plastic scattering across the floor." *Id.* Delmore returned from the bathroom "seconds" later. Dkt. 42-2 at 584, 246. When McKinney asked him again what was happening after he came out of the bathroom, Delmore said, "'All you need to know is I used to be a bad guy, I used to be an assassin, and they need me to go back to my old ways.'" *Id.* at 106. McKinney told him he was acting very strange and Delmore responded that "maybe [he'll] find out later what it was about." *Id.* McKinney submitted a second incident report a day later, describing a search he conducted on December 15 in and

around the recreation staff bathroom. *Id.* at 107. McKinney found a "broken piece of orange scissor handle" near a stack of lockers and under a cabinet shelf "outside the bathroom door." *Id.* McKinney took the piece of scissor handle he recovered to his superiors, where it was secured in evidence. *Id; see also id.* at 109; Dkt. 72-1 at 137.

McKinney also observed another Larch employee's activities on December 2 that was documented in a separate officer's incident report. After the shank was found, McKinney reportedly witnessed Leckie "fishing paperwork out of the grievance box with a ruler" and stating to him, "You saw nothing." Dkt. 48-1 at 31. According to Flynn, she reprimanded Leckie for this violation, but does not recall the level of reprimand. *Id.* at 32.

Acting on "the combination of the concerns that we got from the incarcerated population, the review of the search that took place, [and] the additional information that came in from other sources[,]" Flynn initiated a just cause investigation into Delmore on December 19 and placed him on home assignment. Dkt. 40-1 at 28; Dkt. 42 ¶ 19; Dkt. 42-2 at 38–39; Dkt. 48 at 209. No other Larch officers were the subject of the investigation. *See* Dkt. 48-1 at 11, 21, 23. On December 21, Flynn reached out to her contact at the Clark County Sheriff's Office, Sergeant Duncan Hoss, to have the shank tested for fingerprints. Dkt 68-1 at 3–4; Dkt. 72-1 at 153; Dkt. 40-1 at 41. Based on the evidence log, the piece of scissor handle was not turned over to Clark County until 2020. Dkt. 72-1 at 137.

## C.    DOC's investigative report findings.

On May 5, 2017, DOC Workplace Investigation Services submitted their report on the December 2 incident. Dkt. 42-2 at 2. The nearly six-month investigation interviewed thirty-one witnesses, including several interviews with Delmore. *Id.* at 3, 18–19. The report itself summarized the investigation into a 36-page report with 625 pages of supporting addendum. *See generally id.* Additional details about Delmore's conduct on December 2 emerged. Larch inmate

1    Anderson, who had initiated the chain of events by allegedly picking up the kite and relaying to

2    Delmore that there was a "knife under the mattress of SSU C14L," Dkt. 42-2 at 80, claimed that

3    Delmore put pressure on him after the shank was found, *id.* at 9. "Offender Anderson stated that

4    CO2 Delmore had motioned for him to follow Delmore to the [c]ounselor's office area and told

5    Offender Anderson to, '[k]eep this between you and me' and '[y]ou have to have my back on

6    this." *Id.* Delmore denied making these statements to Anderson and denied speaking with

7    Anderson again after their first interaction involving the kite. *Id.* at 31. Inmate Daniel Carter,

8    whom Delmore had requested the investigator speak to, affirmed Anderson's account that he saw

9    Delmore and Anderson speaking that evening after the shank was found in the counselor's office

10   area, but did not hear their conversation. *Id.* at 30.

11       Anderson also alleged that later that same day, "Delmore came onto B Tier, asked to talk

12   to him, walked halfway down the tier and said out loud in front of other offenders, '[w]e found

13   it,'" referring to the knife. *See id* at 9, 31. Anderson explained in his statement that Delmore's

14   action made it so his "[whole] tier thinks I'm telling on someone[.]" *Id.* at 31. Anderson prepared

15   his statement on December 4, but only after requesting that another Larch officer take him into

16   protective custody because he "fear[ed] retaliation from CO2 Delmore." *Id.* at 29. Delmore

17   initially denied this conversation took place, but the report noted two written statements by Larch

18   staff that relayed inmate statements that corroborated Anderson's narrative. *Id.* at 589, 31–32.

19   When the investigator followed up with Delmore about reports that he was seen on B tier with

20   Anderson and overheard referring to the knife being found, Delmore replied that "CPM [Miller]

21   had told me that he wanted to see Mr. Anderson. I went to the tier. I called him out and started to

22   say it but I stopped . . . and told [CPM Miller] that I can't because it would not look right." *Id.* at

23   589. The report notes that "CPM Miller did not remember that happening and that he could not

24

recall" and that he "thought that he did not talk to Offender Anderson until he had already gone to [Protective Custody] . . . which was after 12/04/2016." *Id.* at 33.

The investigator also questioned Delmore about borrowing the hammer and his comments to former CO2 McKinney[3] about why he needed it. Dkt. 42-2 at 581–86. Delmore first denied ever requesting or checking out a hammer from the tool cage. *Id.* at 582. But when the investigator asked why his prints might be located on a hammer from the Larch recreation tool cage, Delmore responded, "I uh, the day of this thing. My belt was broken." *Id.* Delmore then explained that he took the hammer into the bathroom, placed his belt on the floor, and "tapped my belt swivel so it would stop coming off, so I could buckle it." *Id.* at 583–84. When asked how long he was in the bathroom Delmore first stated "a couple seconds . . . 'tap, tap, tap.'" *Id.* at 584. He later mentioned that to fix his belt, which was under his duty belt, he had to take his "stuff off." *Id.* The investigator then questioned whether he had time to do that if he was there for only a few seconds, to which Delmore responded, "Seconds . . . well, just long enough to take my belt off, and fix it and put it back on." *Id.*

In a follow up interview one month later, Delmore told the investigator, "I didn't put my duty belt on the floor," but that he hung it on a hook. *Id* at 621. When asked about his previous statement that he had put the belt on the floor, Delmore said he didn't remember. *Id.* The investigator noted that there is a hook in the recreation employee bathroom, but it is inside the stall on the backside of the door. *Id.* at 19. The investigator also noted former CO2 McKinney's statements that Delmore was in the bathroom for "10-15 . . . seconds." *Id; see also id.* at 246. When asked if Delmore had enough time to take off his duty belt, fix part of his underlying belt, put it on and come back out in that time, McKinney said "No [w]ay." *Id.* at 247. Delmore also

---

[3] McKinney's last day at Larch was December 16, 2016, coinciding with the date of his second incident report where he located the broken scissor handle. Dkt. 42-2 at 3, 107.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE DEFENSES - 8

denied making the statements reported by McKinney that he "used to be a bad guy . . . used to be an assassin, and they need me to go back to my old ways." *Id.* at 585. He told the investigator that he and McKinney "did not get along" and that they "had a working relationship but we don't get along." *Id.* at 586.

The report also noted where the investigation was inconclusive. Related to the allegation that Delmore had "placed an anonymous [o]ffender's [k]ite under the office door of CUS Richard Johnston," the investigator concluded that "none of the offenders or staff [interviewed] had any first-hand witness information related to who placed the kite into the office of CUS Johnston or who had written it." *Id.* at 25, 29.

**D.    Delmore is terminated.**

On May 10, 2017, five days after the investigative report was completed and two days after Flynn received the "final case" copy, Flynn issued Delmore a pre-disciplinary letter. Dkt. 48-1 at 73; Dkt 72-1 at 145. The letter advised him that Larch was "considering taking disciplinary action . . . up to and including discharge." Dkt. 48-1 at 73. The letter also included a copy of the report and a pre-disciplinary meeting notice offering Delmore "an opportunity to respond to the allegations and to present any information" before Flynn's determination. *Id.* at 74.

On May 24, Delmore and his union representative, Talisa Boad, attended the pre-disciplinary hearing. Dkt. 49 ¶ 2; Dkt. 42-3 at 3. In advance of the hearing, the union "collected letters from Delmore's Larch colleagues attesting to his character, reputation, and work ethic." Dkt. 49 ¶ 5; *see also id.* at 5-9. The union rep handed the letters to Flynn in a folder at the hearing and noted that she did not open the folder during the meeting or ask questions about the letters. *Id.* Flynn does not recall receiving the letters. Dkt. 72-1 at 5.

Delmore shared his version of the events on December 2, which contained some discrepancies from his previous accounts. *See* Dkt. 42-3 at 3–5. Flynn noted that during the May 24 meeting, Delmore's union rep "made a statement regarding Offender Perry A. picking the kite up off the floor of the CUS'[s] office" but Delmore later stated in the meeting that CUS Johnston picked up the kite. *Id.* at 6. When Flynn followed up with him about who picked up the kite, Delmore "responded that CUS picked up the kite." *Id.* Flynn remarked that Delmore's statement was "clearly contradictory to other reports [he] made throughout the incident and the investigation." Dkt. 42-3; *see also* Dkt. 42-2 at 80 ("I then saw Offender Anderson pick something that looked like a kite off the floor and hand it to CUS Johnston."); *Id.* at 573 ("Inv[estigator]: "Was it Perry Anderson that picked it up? [Delmore]: YEP."). In another instance documented in Delmore's termination letter, Flynn noted that "[d]uring the investigation, you stated you returned from the boot room and called Offender Perry A. to the duty station to find out what the kite said." Dkt. 42-3 at 9; *see* Dkt. 42-2 at 80 ("After returning from the bootroom . . . I called Offender Anderson back to the duty station."). But at the May 24 hearing, Flynn recounted Delmore's statement that he "left for the boot room and asked Offender Perry A. what the kite said after you saw him there." Dkt. 42-3 at 9. After summarizing the conflicting statements, Flynn wrote that they "leave me questioning your credibility that this was the only conversation you had with Offender Perry A." *Id.*

On September 6, 2017, Flynn terminated Delmore's employment at Larch. *Id.* at 2. In her 13-page termination letter, Flynn reviewed the allegations against Delmore, his statements disputing the allegations at the pre-disciplinary meeting, and her conclusions based on the record. *Id.* at 2–11. The letter listed four of the initial six allegations as the basis for termination, including that Delmore had fabricated and planted the shank in C-14L, his comments to McKinney in the Recreation building, and his "coercive comments" to Larch inmate Perry. *Id.* at

2–3. Referencing the report's findings, Flynn found that Delmore had committed the alleged misconduct, *see id.* at 5–9, and that she did "not find [Delmore's] version of events credible" based on "far too many conflicting statements." *Id.* at 5 The termination letter did not reference the allegation that Delmore placed the anonymous "kite" in CUS Johnston's office, which the investigator had noted was not substantiated by any "first-hand witness information." *Id.* at 2–3; Dkt. 42-2 at 29.

Flynn terminated Delmore despite finding "no prior discipline" in his personnel file, and a service record of over five years with DOC. Dkt. 42-3 at 11. Flynn noted that "had the[] comments [to McKinney and Perry] been the only misconduct, a lower level of discipline may have been warranted." *Id.* at 13. But Delmore's "decision to introduce a shank into a correctional facility to set up Offender Ronald L. demonstrates your blatant disregard for the safety of staff members and offenders at [Larch]." *Id.* at 12. Flynn wrote that "[i]t is inconceivable with this conduct alone that you could return to being a successful member of DOC" and that [t]he risk of allowing you back into a correctional facility cannot be justified." *Id.* Flynn also noted that the "investigation clearly shows a consistent pattern of your dishonesty . . . and unwillingness to take responsibility for your actions." *Id.* at 13. Finally, Flynn concluded that in addition to Delmore's actions "violating Department expectations and DOC policy, [his] behavior was also unlawful," prompting his dismissal. *Id.* at 13.

### E.    EEOC complaint, union grievance, and Clark County's criminal investigation.

While the investigation was ongoing—and Delmore was on home assignment—he initiated an Equal Employment Opportunity Commission ("EEOC") charge process alleging discrimination and retaliation based on race. Dkt. 48-1 at 209–10. Flynn and DOC's HR unit received notification of the complaint on January 25, 2017. *Id.* at 210. On March 15, Delmore filed a formal EEOC charge alleging race discrimination, *id.* at 209, which DOC received on

March 23. *Id.* at 130.  On August 18, 2017, DOC submitted its response to Delmore's EEOC complaint. Dkt. 48-1 at 122.

On July 18, 2017, Sergeant Hoss emailed Flynn and the DOC investigator to arrange a meeting. Dkt. 72-1 at 152–53. In an internal email summarizing that meeting on August 14, Flynn wrote that "there will not be a criminal report provided from Clark County based on their conversation with me about launching a criminal investigation." *Id.* at 156. Instead, they discussed that DOC would "turn over documents from [its] investigation to prepare to use in their investigation." *Id.* On August 21, Flynn emailed Hoss asking if DOC could "get a statement from [his] department indicating the discovery of the fingerprints" on the shank submitted to the Sheriff's Office in December 2016. Dkt. 68-1 at 21. Flynn indicated that the reason was "more to include in our process to close our case, but not to impact your criminal investigation[.]" *Id.* In his reply, Hoss said that releasing a statement would "tip all of our information to the possible suspect before he has a chance to be interviewed[,] which handcuffs the investigation." *Id.* Hoss offered Flynn a choice that if she "need[ed] to get the findings right away, then I will release them, and not move forward on the criminal investigation. Or we can wait until after we have a chance to interview the subject and then release a[] notice of findings." *Id.* Flynn responded that she did "NOT want to jeopardize this case in any way," that it was "too significant to allow any compromise to occur" and that she planned to "turn[] everything we have over to [the Sheriff's Office], minus Delmore's statement." *Id.* Flynn's email requesting the statement was sent three days after DOC's EEOC response, and roughly two weeks before Delmore was terminated. *See* Dkt. 42-3 at 3.

On September 26, 2017, Delmore filed a Step 1 grievance through his union. Dkt. 48-1 at 112; *see* Dkt. 72-1 at 174. The grievance letter alleged that Delmore's termination was a violation of the Collective Bargaining Agreement (CBA) "including but not limited to the Just

Cause provision in Article 8," and requested "a full make-whole remedy including reinstatement." Dkt. 48-1 at 112–13. Delmore's grievance was assigned to Deputy Secretary Scott Russell, Flynn's superior. *Id.* at 114. Also on September 26, Flynn wrote to Hoss "checking in" on the status of the criminal investigation. Dkt. 48-1 at 152. In a declaration, Flynn stated that "[a]s this matter proceeded through the employment process, [her] superiors would ask for updates regarding the status of the criminal matter." Dkt. 78 at 2. Flynn "check[ed] in" again on the criminal investigation on October 11. Dkt. 72-1 at 159–60. Hoss shared that it was being "put on hold for a bit" because the investigator in charge of the Delmore case was busy on another case. *Id.* at 159. Flynn forwarded Hoss's response to Russell. *Id.* On December 1, Russell reviewed and denied Delmore's Step 1 grievance. *See* 48-1 at 115, 118–19.

On December 5, Delmore filed the next level of grievance, a demand for arbitration, which begins with a Pre-Arbitration Review Meeting ("PARM"). *Id.* at 118–19; Dkt. 72-1 at 174. According to the CBA, within 14 days of the demand for arbitration, the DOC Labor Relations staff will either (1) schedule the PARM, or (2) notify the union that no PARM will be scheduled. Dkt. 72-1 at 176. Flynn received notification of the request for arbitration and PARM on December 8 at 1:40pm. *Id.* at 162. At 1:42pm, Flynn emailed Hoss, "checking in to see where the prosecutor is at on the Delmore case." *Id.* at 165–66. Flynn did not receive a response. *See id.* at 165. Flynn emailed Hoss again on December 19 requesting an "update for me and Deputy Director Russell" and explaining that "[w]e are pushing up against actions with this terminated employee." *Id.* at 165. Hoss responded the next day, writing to Flynn and Russell that "I have moved it up. Detective Neiman has it on his desk now." *Id.*

On January 3, 2018, Detective Neiman contacted Delmore and asked whether he had any pertinent information to share about the December 2, 2016 incident given that "all of his statements had been redacted" from the DOC report. Dkt. 68-1 at 26. Through his attorney,

Delmore said he would not be providing any statements. *Id.* at 27. On January 8, Neiman contacted Delmore's attorney that he had "probable cause for the arrest of Julian Delmore for Possession of a Deadly Weapon in Correctional Institution, RCW 9.94.043 and Malicious Prosecution, RCW 9.62.010." *Id*; *see also id.* at 29–31. As detailed in his probable cause statement, Neiman's charging decision was based on the DOC investigative report and fingerprint analysis of the shank. *Id.* at 23–27; 29–31. Delmore was arrested that same day. *Id.* at 27.

On January 9, Flynn forwarded the notification of arrest to Russell and the DOC Labor Relations staff in charge of the PARM. *See* Dkt. 72-1 at 188. The DOC Labor Relations lead for Delmore's PARM responded that "I wonder if we should let Sarena [Delmore's union rep] know that we won't be scheduling the PARM as of yet." *Id.* Between September 2018 and April 2019, internal emails between DOC Labor Relations staff consistently communicated they were "holding off" on scheduling the PARM and that "this grievance is currently on hold until the court results come through." *See id.* at 191, 193–94, 197–98. 200. Of these exchanges, Flynn is only a participant in one of the emails, forwarding a notice sent to her about the initial trial date in Delmore's case to DOC Labor Relations staff with the message, "Just a heads up since it relates to the PARM notification that just went out." *Id.* at 200.

In October 2019, Detective Neiman emailed Flynn seeking Delmore's unredacted statements from the DOC investigation. *Id.* at 207. Neiman wrote that while the redacted report "was appropriate at the time for a criminal investigation[,] [t]he prosecutor is now requesting the un-redacted statement of Julian Delmore." *Id.* at 207. Neiman asked Flynn if she was "able to provide this for upcoming trial preparations." *Id*. Flynn forwarded the request to a DOC attorney, stating she "ha[d] concerns about this because of *Garrity*. Please advise." *Id.* (italics added). Neiman eventually made a public records request in November 2019 and received the unredacted

statements from the Washington State Attorney General's office four months later. *Id.* at 214. According to the DOC interview acknowledgment form Delmore signed, DOC could release information "pursuant to . . . RCW 42.56 (The Public Records Act)." Dkt. 68-1 at 40.

## F.    Procedural History

Delmore filed this lawsuit on August 27, 2021, asserting claims of race discrimination and retaliation against DOC and Flynn in violation of 42 U.S.C. §§ 1981 and 1983 and the Washington Law Against Discrimination. Dkt. 1 ¶¶ 36, 38, 39–48, 54–67. On December 1, 2022, Defendants moved to dismiss all claims as barred by the applicable statutes of limitations. Dkt. 25. On January 4, 2023, the Court granted Defendants' motion in part, dismissing the state law claims, but allowing the federal causes of action to proceed. Dkt. 29.

On June 10, 2024, Defendants moved for summary judgment on the remaining federal claims, arguing that Delmore could not assert a prima facie case of race discrimination or retaliation. Dkt. 39. Defendants argue that even if Delmore could make a prima facie case of race discrimination, DOC had a legitimate, non-pretextual reason for termination. *Id.* at 1–2; 15–16. Defendants also argue that Delmore cannot show a prima facie case of retaliation. *Id.* at 17–19. Delmore responded on July 10, Dkt. 47, and Defendants replied on July 26, Dkt. 52.

 In the period between Defendants' motion for summary judgment and Delmore's response, Delmore received supplemental responses to an earlier third-party subpoena issued to his union. Dkt. 48 ¶ 3. Delmore contended that those documents should have been produced by Defendants during discovery. *Id.* Defendants re-ran their search for electronic records and returned approximately 9,000 potentially responsive documents, at least some of which were not produced during the initial discovery phase. Dkt. 57 at 5. On August 13, 2024, the Court found there was good cause to continue the trial date and allow supplemental discovery and briefing on the pending summary judgment motion. Dkt. 58.

On December 18, 2024, both parties filed their supplemental briefs. Dkt. 67; Dkt. 71. Defendants' surreply argued for the first time that Delmore's section 1981 claim does not create a cause of action against DOC and that it is immune from the suit under the Eleventh Amendment. Dkt. 67 at 6–7. Delmore's own surreply cross-moved for summary judgment on his retaliation claim. Dkt. 71 at 3, 14–16. Because of Delmore's new request for summary judgment, the Court granted Defendants leave to respond, Dkt. 76, which Defendants filed on December 30, 2024.

On January 30, 2025, four days before Motions in Limine were due for trial, Delmore moved to strike the defenses of subject matter jurisdiction and Eleventh Amendment immunity raised in DOC's supplemental briefing, or in the alternative, for leave to amend his complaint to substitute the current DOC Secretary in his official capacity. Dkt. 83; Dkt. 94. Given the scope of new issues raised by the parties on the eve of pretrial deadlines, the Court determined there was good cause to continue the trial and reset pretrial deadlines. Dkt. 85. Since the continuance, Defendants have responded to Delmore's motion to strike DOC's defense or leave to amend, Dkt. 92, and Plaintiff has replied. Dkt. 94. The motions are fully briefed and ripe for the Court's consideration.

### III.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party may fulfill its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case,"

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), or by producing "evidence negating an essential element of the nonmoving party's claim." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry their ultimate burden of persuasion, the movant "must persuade the court that there is no genuine issue of material fact." *Id.* The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323.

## IV.    DISCUSSION

### A.    Delmore cannot show Defendants subjected him to disparate treatment in violation of Sections 1981 and 1983.

Delmore has not shown a genuine issue of material fact that because of his race, he was investigated and terminated. Section 1981(a) provides, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of the laws . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The "prohibition on discrimination by a state or its officials contained in § 1981 can be enforced against state actors only by means of § 1983." *Pittman v. Oregon, Employment Dept.*, 509 F.3d 1065, 1068 (9th Cir. 2007) (citing *Jett v. Dallas Independent School District*, 491 U.S. 701, 733 (1989)). In the Ninth Circuit, the "legal principles guiding a court in a Title VII dispute apply with equal force in a § 1981 action." *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003); *see also Kitazi v. Sellen Construction Company, Inc.*, C16-1651-MJP, 2017 WL 5455372, at *3 (Nov. 14, 2017) (analyzing an employee's Title VII and § 1981 race discrimination claims under the same *McDonnell Douglas* framework).

There is one notable distinction in analyzing discrimination claims under § 1981. Delmore must also show "that, but for race, he would not have suffered the loss of a legally

1  protected right." *Brown v. King County*, 823 F. App'x. 478, 480 (9th Cir. 2020) (quoting

2  *Comcast Corp. v. Nat'l Assn. of African Am.-Owned Media*, 589 U.S. 327, 336 (2020)).

3         *McDonnell Douglas* outlined a three-part, burden-shifting framework that may be used to

4  determine whether there is sufficient evidence to prove discrimination in violation of Title VII.

5  *Lui v. DeJoy,* 129 F.4th 770, 776 (9th Cir. 2025) (citing *McDonnell Douglas Corp. v. Green,* 411

6  U.S. 792, 802–04 (1973)):

7         First, the plaintiff has the burden of proving by the preponderance of the evidence
8         a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the
       prima facie case, the burden shifts to the defendant to 'articulate some legitimate,
9         nondiscriminatory reason for the employee's rejection.' Third, should the defendant
       carry this burden, the plaintiff must then have an opportunity to prove by a
10        preponderance of the evidence that the legitimate reasons offered by the defendant
       were not its true reasons, but were a pretext for discrimination.

11  *Id.* (quoting *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981)). To show a

12  prima facie case of disparate treatment, a plaintiff must offer evidence that "give[s] rise to an

13  inference of unlawful discrimination." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 690-91

14  (9th Cir. 2017) (quoting *Texas Dep't of Cmty. Affs.* 450 U.S. at 253). "One way to establish an

15  inference of discrimination is by satisfying the prima facie elements" from *McDonnell Douglas*.

16  *Reynaga*, 847 F.3d at 690 (9th Cir. 2017) (citation omitted). A plaintiff's "requisite degree of

17  proof [in making a prima facie case] . . . is minimal[.]" *Lui*, 129 F.4th at 776 (quoting *Wallis v.*

18  *J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

19         *1.     Prima facie case*

20         To establish a prima facie case of discrimination, the plaintiff must show "1) [he] belongs

21  to a protected class, (2) he was performing according to his employer's legitimate expectations,

22  (3) he suffered an adverse employment action, and (4) similarly situated employees were treated

23  more favorably, or other circumstances surrounding the adverse employment action give rise to

24  an inference of discrimination." *Reynaga*, 847 F.3d at 691 (citations omitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### a)    *Decision to Investigate*

The parties do not dispute that Delmore has satisfied the first two elements. *See* Dkt. 39 at 9; Dkt. 47 at 24–25. Defendants also "do not contest . . . the third [element] as to his termination (the ultimate adverse employment action)[.]" Dkt. 39 at 9. Yet Plaintiff argues that in addition to Delmore's disparate treatment with respect to the termination decision, "Flynn treated similarly situated white employees differently in her decision to investigate, from which the ultimate decision to terminate flowed[.]" Before evaluating whether Delmore was treated differently than his white counterparts by Flynn's decision to investigate him, we must establish that the decision to investigate was an adverse employment action. *See Reynaga*, 847 F.3d at 690–91.

"To make out a Title VII discrimination claim, a [plaintiff] must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 354–55 (2024). The plaintiff does not need to show "that the harm incurred was 'significant' . . . [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 355 (internal citation omitted).

In *Campbell v. Hawaii Department of Education*, a teacher argued that her school's decision to "instigate an investigation against her" based on several complaints of misconduct was an adverse employment action. 892 F.3d 1005, 1013 (9th Cir. 2018). During the investigation, the teacher was allowed to work as normal. *Id.* The Ninth Circuit found that the "mere fact that the school received and investigated allegations of misconduct against [the teacher]—with no resulting change to the conditions of her employment—is not an adverse employment action for purposes of her disparate treatment claim." *Id.*

But the court "suggest[ed] that involuntary leave with pay might constitute an adverse employment action." *Campbell v. Department of Human Services*, 384 F. Supp. 3d 1209, 1222 (D. Haw. 2019). In the Ninth Circuit case, the female teacher complained that "unlike some male teachers who were put on administrative leave while the school investigated complaints against them, she was never given leave with pay." *Campbell*, 892 F.3d at 1014. The court summarized the female teacher's complaint as "essentially complaining that the DOE chose *not* to alter the terms and conditions of her employment." *Id.* (emphasis in original). "By not placing [the female teacher] on leave, the DOE instead allowed her to continue working just as she had before, with no changes in her duties or the conditions of her work." *Id.* Thus, the Ninth Circuit indicated that involuntary paid leave would alter the terms and conditions of employment. *Campbell*, 384 F. Supp. 3d at 1222; *see Campbell*, 892 F.3d at 1014.

Delmore was placed on home assignment, a form of involuntary paid leave, pending investigation into his alleged misconduct on December 2, 2016. Dkt. 48-1 at 124; *see* Dkt. 69-1 at 6. According to his CBA, home assignments are used "as a result of a disciplinary investigation . . . [and] only . . . when management determines the alleged misconduct is so serious in nature as to warrant the removal of the employee from work." *Id.* An employee is "placed and maintained on paid leave for the duration of the home assignment." *Id.* Although it is unclear whether Delmore could "show some harm respecting an identifiable term or condition of employment" based only on Flynn's decision to investigate, *Muldrow*, 601 U.S. at 354–55, his involuntary home assignment *because of* the disciplinary investigation is an adverse employment action. *See Campbell*, 892 F.3d at 1014 (emphasis added).

Even if Flynn's decision to investigate Delmore and place him on home assignment is an adverse employment action, Delmore must still establish the fourth element of a prima facie disparate treatment claim. A plaintiff can show they meet the fourth element "through

comparison to similarly situated individuals, or any other circumstances 'surrounding the adverse

employment action [that] give rise to an inference of discrimination.'" *Hawn v. Executive Jet*

*Management, Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2008) (quoting *Peterson v. Hewlett–Packard*

*Co.*, 358 F.3d 599, 603 (9th Cir. 2004)).

Delmore cannot show that he was "similarly situated" to comparable white Larch

employees when Flynn launched the investigation. "To establish similarity under the *McDonnell*

*Douglas* framework, the individuals being compared 'need not be identical; they must only be

similar in all material respects.'" *Ballou v. McElvain*, 29 F.4th 413, 423 (9th Cir. 2022) (quoting

*Hawn*, 615 F.3d at 1157). "[I]ndividuals are similarly situated when they have similar jobs and

display similar conduct." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).

Delmore argues that Flynn's decision not to investigate Sergeant Leckie, a white Larch employee

who was also named in inmate complaints before Delmore's investigation was launched, shows

he was treated less favorably. Dkt. 47 at 25; Dkt. 42-2 at 84–85. In addition to the inmate

complaints, Delmore cites an incident report where Leckie was seen by McKinney "fishing

paperwork out of the grievance box with a ruler" after the shank was found and stating, "You

saw nothing." Dkt. 48-1 at 31. According to Flynn, she reprimanded Leckie for this violation, but

he was not terminated. *See id.* at 32.

But Leckie and Delmore's alleged violations of Larch policy did not "display similar

conduct." *Vasquez*, 349 F.3d at 641. The Ninth Circuit's decisions in *Vasquez* and *Ballou* are

instructive. In *Vasquez*, two probation officers organized a football game at a youth detention

center that violated the center's policy. *Id.* at 638. Before the game, Vasquez had requested

permission from his supervisor to play football, which the supervisor had denied. *Id.* The other

officer that organized the game did not know he was disobeying a direct order by participating.

*Id.* at 641. Following the incident, Vasquez was the only officer transferred from his post. *Id.* at

639. The court found that while the two officers "held the same position, they were . . . not similarly situated . . . [because the second officer] did not engage in problematic conduct of comparable seriousness to that of Vasquez." *Id.* at 641.

In *Ballou*, a female police officer was passed over for promotion because an internal investigation showed she had violated department policy by failing to file some reports based on citizen complaints. 29 F.4th at 418–19. The department promoted a male police officer of the same rank instead who had been previously reprimanded for failing to write a report on a sexual assault call. *Id.* at 419. The court found the officers were similarly situated to support the female officer's prima facie case, contrasting its finding with *Vasquez* because "in this case [the two officers] were both accused of the same conduct: failure to write a report." *Id.* at 423–24.

Here, Delmore and Leckie's alleged violations are closer to *Vasquez* than *Ballou*. Although both employees had been named in inmate complaints as being involved in the shank incident and both involved eyewitness accounts from McKinney of behavior in violation of Larch policy, the allegations against Delmore at the pre-investigation stage were considerably more serious. McKinney's account of Delmore's actions before the shank was found include: Delmore's refusal to say why he was checking out the hammer from recreation; the loud sound he reported as broken plastic pieces on the floor when Delmore went into the bathroom; his comments that he "used to be an assassin, and they need me to go back to my old ways" and that "maybe [he'll] find out later what it was about"; and McKinney's recovery of physical evidence, the broken piece of scissor handle near the bathroom door. Dkt. 42-2 at 106–07, 246, 584. All of which helped support the inmates' allegations that Delmore was involved in making and planting the shank. *Id.* at 84, 91; Dkt. 40-1 at 28. In contrast, Leckie's alleged violation did not introduce a comparable security threat of violence into Larch. *See* Dkt. 48-1 at 31. Because Leckie "did not

engage in problematic conduct of comparable seriousness to that of [Delmore,]" he was not similarly situated. *See Vasquez*, 349 F.3d at 641.

Delmore's other potential comparators are also not similarly situated. The cover letter to the coordinated group of inmate letters to DOC written by Osborn also named "Ofc. Bergstrom" as being involved in the December 2 incident. Dkt. 42-2 at 85. Bergstrom, like Delmore, was a CO2 at the time of the incident. Dkt. 42 ¶ 10. But unlike Delmore, whose name was mentioned in several inmate complaints concerning his role in making and planting the shank, *see id.* at 84–85, 90–91, Bergstrom was mentioned only twice as being generally "involved," *see* Dkt. 42-2 at 85, 98. And even then, the only written inmate complaint that DOC received before Flynn's decision to investigate did not mention Bergstrom's involvement in the December 2 incident. *See id.* at 84; *see also id.* at 29. Unlike Delmore, there were also no employee reports about Bergstrom's questionable conduct on December 2, or physical evidence recovered that could link him to the making or planting of the shank. *Id.* at 106–07, 109. No other Larch officers present on December 2—except CUS Johnston who was investigated, *see infra* Sec. IV.A.1.b—were implicated by fellow officers or inmates for violative conduct. Dkt. 42 ¶¶ 8, 9, 11; *see also* Dkt. 42-2 at 85–98.

Although Delmore cannot demonstrate a prima facie case by showing that similarly situated white individuals were treated more favorably, he can still make his prima facie case by demonstrating that "other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga*, 847 F.3d at 691 (9th Cir. 2017); *see also Lui*, 129 F.4th at 778 ("The fourth element of the *McDonnell-Douglas* prima facie test [i]s a catch-all requiring only that the adverse action occurred under circumstances giving rise to an inference of discrimination.") (cleaned up). The Ninth Circuit has explained that a plaintiff may show "an inference of discrimination in whatever manner is appropriate in the particular circumstances."

*Hawn*, 615 F.3d at 1156 (citation omitted). A plaintiff may "offer direct or circumstantial evidence of discriminatory motive[.]" *Opara v. Yellen*, 57 F.4th 709, 722 (9th Cir. 2023). Direct evidence has been defined as "conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude[.]" *Id.* (cleaned up); *see also Dominguez-Curry v. Nev. Transp. Dep't,* 424 F.3d 1027, 1039–40 (9th Cir. 2005) (similar). "When a plaintiff ... seeks to establish a prima facie case through the submission of actual evidence, very little such evidence is necessary." *Opara*, 57 F.4th at 723 (quoting *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996)); *see also Dominguez-Curry*, 424 F.3d at 1039 ("[I]n this circuit, we have repeatedly held that a single discriminatory comment by a plaintiff's supervisor or decisionmaker is sufficient to preclude summary judgment for the employer.") (citations omitted).

Here, Delmore does offer at least one discriminatory comment by Flynn: her remark at an unrelated union grievance hearing stating, "I don't treat white people any different than colored people." *See* Dkt. 48-1 at 63; Dkt. 42 ¶ 25.[4] Although Flynn's comment "may be viewed as directly reflecting the alleged discriminatory attitude," *Opara*, 57 F.4th at 722, the comment was not made in connection with the Delmore investigation. *See* Dkt. 42 ¶ 25. More importantly, Flynn's comment occurred four years after her decision to terminate Delmore, and nearly five years after her decision to investigate him. *See id*; *see also Reynaga*, 847 F.3d at 691 (requiring "other circumstances *surrounding the adverse employment action* [that] give rise to an inference of discrimination") (emphasis added). Relatedly, Delmore points to a comment Flynn made in

---

[4] Flynn acknowledges making this statement and that it led to an investigation of and disciplinary action against her. Dkt. 42 ¶ 25. She contends that she misspoke, meant to say "people of color," and remains "mortified" by her words. *Id.* While it is possible a jury evaluating Flynn's credibility would accept her explanation, the Court draws all inferences in favor of Delmore and recognizes the use of the phrase "colored people" as discriminatory on its face.

her deposition that explains how the shank allegedly being planted in the bunk of a white inmate "could really be a danger to our other African-American staff and – and even our regular staff[.]" Dkt. 47 at 18; Dkt. 48-1 at 60.

*Cordova v. State Farm Insurance Companies*, 124 F.3d 1145 (9th Cir. 1997) is instructive. There, a Mexican-American woman employed by State Farm as a claims representative was denied a trainee agent position and claimed the denial was based on her national origin and sex. *Id.* at 1147. Another woman ultimately got the position and submitted an affidavit that once she was hired, the hiring manager referred to a different Hispanic agent as a "dumb Mexican." *Id.* The court first noted that the comment was an "egregious and bigoted insult" and "could be proof of discrimination against Cordova despite their reference to another agent and their utterance after the hiring decision." *Id.* at 1149. The Ninth Circuit reasoned that because the hiring manager that made the comment was the same one who selected the trainee agent, "if he ha[d] any animus towards Mexicans, it likely would have affected his trainee agent decision as well." *Id.* (citing *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995)). The court also stated that "the timing of his alleged remarks is not so far removed from the contested hiring decision so as to render them completely unrelated to that decision." *Id.* Finally, the court noted that the comment was "not the only evidence Cordova offers to establish a prima facie case." *Id.*

Here, unlike the derogatory comment in *Cordova* made in the immediate aftermath of the disputed employment decision, Flynn's admittedly discriminatory comment occurred four years after her decision to terminate Delmore and nearly five years after the initial decision to investigate him, "far removed from the contested [employment] decision" See Dkt. 42 ¶ 25; *Cordova*, 124 F.3d at 1149. Similarly, Flynn's testimony distinguishing Black staff from "regular" staff was made six years after the termination decision and nearly seven years after the

decision to investigate (but in the context of litigation surrounding those decisions). *See* Dkt. 48-1 at 16.

But the Court ultimately does not need to decide whether Flynn's comments are alone sufficient for Delmore's prima facie case because other circumstantial evidence exists. *See Cordova*, 124 F.3d at 1149. Delmore claims that there were "multiple discrimination complaints against Flynn by other Black Larch employees and visits by external entities related to these complaints." Dkt. 47 at 26. Plaintiff cites to three incidents of white Larch employees—two occurring while Delmore was still employed at Larch, and one occurring in the year after his termination—who were investigated for racially discriminatory comments made about Black Larch employees or Black inmates. Dkt. 48-1 at 263–64, 238, 240–41, 135–141. None of these complaints were made against Flynn. *See id.* To the extent Flynn was involved in any of these incidents, it was in her capacity overseeing the investigations, of which the employees received various forms of reprimands. *Id.* at 139–140, 238.

But Plaintiff correctly notes there were "internal and external investigations into racism at Larch" in the months following Flynn's decision to investigate and ultimately terminate Delmore. *See* Dkt. 48-1 at 143 (voluntary "cultural assessment" by NIC into, among other claims, "allegations of institutional racism," and "discriminatory hiring practices."); Dkt. 48-1 at 144–146 (DOC investigator's "independent investigation into allegations contained in two emails from [Larch employee] Sidney Clark . . . alleg[ing] unfair hiring promotion and training opportunities" from 2015 to 2017).

Delmore also argues that allegations from advocacy groups and Larch's union representative represent circumstantial evidence of discrimination. Dkt. 47 at 19, 26. He cites to a letter from the Vancouver chapters of Black Lives Matter, NAACP, and the USDA Coalition of Minority Employees to Governor Jay Inslee six months before the shank incident. Dkt. 48-1 at

222–24. In it, the groups allege "racist" and "discriminatory" employment practices at Larch, express concern about potential retaliation for Sidney Clark's filing of an EEOC complaint, and mention four other employees by name "that have endured injustice and maltreatment." *Id.* Delmore also cites to an affidavit from Boad, Larch's union representative. Dkt. 49 ¶ 8. Boad "observed that Ms. Flynn treated Black and white employees differently . . . routinely treat[ing] Black employees more harshly with respect to discipline, and appeared to target and single them out, especially after they complained about her treatment of them." *Id.*

The record mostly fails to substantiate the allegations that prompted the investigations, the letter to the governor, or the union representative's allegations. Only the cover letter of the NIC report is included in the record, Dkt. 48-1 at 143, and the summary findings in the excerpted DOC report include accounts from employees listing being Black, white, old, a union member, and being unable to perform well in interviews as reasons for the lack of promotion opportunities, *see id.* at 146; *see also id.* at 213 (investigation closure letter from Scott Russell, Flynn's supervisor, to Boad stating, "I agree there are concerns regarding working relationships at [Larch] that we need to help staff work through but not to the level of corrective action, [or] discipline beyond what interventions have occurred to date."). The letter to the governor does not include evidence of any retaliatory behavior by Flynn or DOC or of the alleged "injustice and maltreatment" experienced by the other Larch employees. *See id.* at 223–24. And absent from Boad's claim that Flynn "routinely treated Black employees" differently are any employee names, dates, or details. *See* Dkt. 49 ¶ 8; Dkt. 67 at 8.

Defendants state that the allegations presented by Plaintiff are "hearsay and rumors" and that "the only admissible evidence about racially-charged commentary" is Flynn's comment in the grievance hearing four years after Delmore's termination. Dkt. 52 at 3. "Courts must . . . consider unauthenticated evidence at summary judgment if the evidence can 'be presented in a

*form* that would be admissible' at trial." *Harlow v. Chaffey Community College District*, No. 21-55349, 2022 WL 4077103, at *1 (9th Cir. Sep. 6, 2022) (quoting Fed. R. Civ. P. 56(c)(2) (emphasis in original)). The allegations made in the letter to the governor are both unsubstantiated and presently inadmissible. *See* Dkt. 48-1 at 223–24. But Boad's declaration, even if presently unsubstantiated, potentially could "be presented in a form that would be admissible at trial." *See Harlow*, 2022 WL 4077103, at *1. And while the investigations into race-based employment practices do not show direct evidence of discriminatory conduct at Larch, Scott does acknowledge "concerns regarding working relationships at [Larch] that we need to help staff work through." Dkt. 48-1 at 213.

Neither Delmore's comparator evidence, Flynn's discriminatory comment four years after he was terminated and nearly five years after the decision to investigate, nor the limited circumstantial evidence are likely enough on their own to "give rise to an inference of discrimination." *See Reynaga*, 847 F.3d at 691 (9th Cir. 2017). But viewed together, and because "uncertainty at the summary judgment stage must be resolved in favor of the plaintiff," *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004), Delmore has met the "low threshold of evidence required" for his prima facie case at summary judgment. *Villiarimo*, 281 F.3d at 1062; *see also Cordova*, 124 F.3d at 1149.

### b)    *Decision to Terminate*

Delmore also claims that he was discriminated against based on his race when Flynn terminated his DOC employment. As discussed above, the parties do not dispute the third element of the *McDonnell Douglas* test—that termination is "the ultimate adverse employment action[.]" Dkt. 39 at 9; *see* Dkt. 47 at 24–25. As before, Delmore can meet the fourth element of his prima facie case "through comparison to similarly situated individuals, or any other

circumstances 'surrounding the adverse employment action [that] give rise to an inference of discrimination.'" *Hawn*, 615 F.3d at 1156 (quoting *Peterson*, 358 F.3d at 603).

Relevant to this employment action, Flynn did investigate and reprimand a white Larch employee, CUS Johnston, for his alleged DOC policy violations on December 2. *See* Dkt. 42 ¶¶ 16–18; Dkt. 42-1 at 7–8. Delmore claims that Flynn's decision to demote Johnston but to terminate him shows that she "evaluated Delmore's credibility, history, and the appropriate discipline vastly differently than Johnston's." Dkt. 47 at 17. Defendants argue that Johnston was not "similarly situated" to Delmore because "the two were in entirely different jobs, he had a significantly longer employment history, and his transgressions were qualitatively distinct in nature." Dkt. 39 at 10. The Court agrees with Defendants.

Johnston was a Custodial Unit Supervisor whose responsibilities included supervising sergeants, counselors, correctional officers, and other facility staff, and overseeing an administrative budget of $500,000. Dkt. 42 ¶ 15. Johnston was also a supervisor three steps above Delmore in the Larch hierarchy. *See id.* ¶ 18. Based on his supervisory position and his differentiated responsibilities, and in the context of the allegations here, Johnston is not "similarly situated to lower[-]level employees" like Delmore. *See Vasquez*, 349 F.3d at 641. Even if he were, Johnston's policy infractions did not "display similar conduct" to Delmore's violations. *See id.* Johnston admitted to tearing up the kite that allegedly warned of a knife in bunk C-14. *See* Dkt. 42 ¶ 18. Johnston also admitted to improperly storing evidence in his deck, such as tobacco products and pornographic magazines, and having a steak knife in his desk that he used to eat with. Dkt. 42-1 at 13–17.

First, there is a difference between potentially impeding a security threat response and allegedly introducing such a threat that targeted another inmate. Dkt. 42-3 at 2–3. Second, Johnston's storage of unauthorized contraband, while serious enough to warrant a three-step

demotion, was not allegedly placed into the incarcerated community's living quarters. *See id.* And third, Flynn's demotion letter to Johnston credits his admissions of misconduct during the investigation and the disciplinary hearing. Dkt. 42-1 at 13–17. In contrast, Flynn's termination letter to Delmore noted his shifting account of the events on December 2 and that the "investigation clearly shows a consistent pattern of your dishonesty . . . and unwillingness to take responsibility for your actions." Dkt. 42-3 at 13. Accordingly, Johnston "did not engage in problematic conduct of comparable seriousness to that of [Delmore]." *See Vasquez*, 349 F.3d at 641.

Outside of comparator evidence, the "other circumstances surrounding" the decision to investigate that Delmore has proffered are also relevant to Flynn's termination decision nine months later. *See supra* Sec. IV.A.1.a; *Reynaga*, 847 F.3d at 691. Delmore also lists several other arguments that he states "give[s] rise to an inference of discrimination": Flynn's decision to "terminate him before even reading the entire investigation report"; "refusal to consider, and destruction of, affidavits in support of Delmore"; "her automatic belief in the testimony of offenders and white employees, like CO Nick McKinney despite their obvious motives to lie, credibility issues, and inconsistencies in their testimony"; and disregarding evidence protocols for the piece of scissor handle recovered. Dkt. 47 at 26. Without addressing these arguments yet, *see infra* Sec. IV.A.3.b, and because the Court has already found that he has presented sufficient evidence that "give[s] rise to an inference of discrimination" in the investigation decision, the Court concludes that Delmore has also met the "low threshold of evidence required" to make his prima facie case for the termination decision. *See Villiarimo*, 281 F.3d at 1062; *Reynaga*, 847 F.3d at 691.

1          2.      *Legitimate, nondiscriminatory reasons*

Because Delmore established a prima facie case of discrimination for both Flynn's decision to investigate and decision to terminate, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for [each] challenged action." *Opara*, 57 F.4th at 725 (citing *Chuang v. Univ. of California Davis, Bd. Of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000)) (cleaned up). "This burden is one of production, not persuasion . . . [and] involve[s] no credibility assessment." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)) (cleaned up).

             a)      **Decision to Investigate**

Defendants contend that the decision to investigate Delmore for the December 2 incident was made after "multiple pieces [of evidence] . . . came in that caused great alarm" to Flynn. *See* Dkt. 40-1 at 27. Between December 2 and the launch of the investigation on December 19, several inmate complaints implicated Delmore in the making and planting of the shank. Dkt. 42-2 at 84–85, 90–91. A December 15 incident report submitted by McKinney described Delmore's suspicious behavior and comments in the hours leading up to the shank's discovery on December 2, including his refusal to say why he was checking out the hammer from recreation; a loud "bang" that sounded like "pieces of plastic scattering across the floor" after Delmore went into the bathroom; and his comments that he "used to be an assassin, and they need me to go back to my old ways" and that "maybe [he'll] find out later what it was about[.]" Dkt. 42-2 at 106. And on December 16, McKinney's second incident report documented his recovery of the broken piece of scissor handle outside the door to the staff bathroom that Delmore took the hammer into. *Id.* at 107. Flynn initiated the investigation into Delmore on December 19 based on "the combination of the concerns that we got from the incarcerated population, the review of the search that took place, [and] the additional information that came in from other sources[.]" Dkt.

40-1 at 28; *see* Dkt. 42 ¶ 19; Dkt. 42-2 at 38–39. "By offering these explanations, [Defendants]

ha[ve] articulated legitimate, nondiscriminatory reasons for its actions." *See Chuang*, 225 F.3d at

1126.

### b) Decision to Terminate

Defendants also assert that the decision to terminate was for legitimate,

nondiscriminatory reasons. As described in Flynn's 13-page termination letter to Delmore, the

decision was based on the findings of a six-month independent investigation, Delmore's

statements disputing the allegations at the pre-disciplinary meeting, and her conclusions based on

the record developed. Dkt. 42-3 at 2–11. Flynn found that Delmore had committed the alleged

misconduct, *see id.* at 5–9, and that she did "not find [Delmore's] version of events credible"

based on "far too many conflicting statements." *Id.* at 5 Flynn chose termination, as opposed to a

less severe reprimand, because Delmore's "decision to introduce a shank into a correctional

facility . . . demonstrate[d] [his] blatant disregard for the safety of staff members and offenders,"

making it "inconceivable . . . [he]could return to being a successful member of DOC." *Id* at 12.

As with the decision to investigate, Defendants have articulated some legitimate,

nondiscriminatory reason for its challenged action. *See Opara*, 57 F.4th at 725.

### 3. Pretext

Once an employer "articulates some legitimate, nondiscriminatory reason for the

challenged action, the employee must show that the articulated reason is pretextual." *Id.* at 723.

Like at the prima facie stage, a plaintiff "can prove pretext in multiple ways, either: (1) 'directly,

by showing that unlawful discrimination more likely [than not] motivated the employer;' (2)

'indirectly, by showing that the employer's proffered explanation is unworthy of credence

because it is internally inconsistent or otherwise not believable;' or via 'a combination of the[se]

two kinds of evidence.'" *Id.* (quoting *Chuang*, 225 F.3d at 1127) (cleaned up).

"Generally, 'very little[ ] evidence is necessary to raise a genuine issue of fact regarding an employer's motive.'" *Id.* at 723–24 (quoting *Schnidrig*, 80 F.3d at 1409). "The Supreme Court has instructed that 'a plaintiff's prima facie case, combined with . . . evidence . . . that the employer's asserted justification is *false*, may' be enough." *Id.* at 724 (emphasis in original) (quoting *Reeves*, 530 U.S. at 148). Still, "a plaintiff's burden is much less at the prima facie stage than at the pretext stage." *Hawn*, 615 F.3d at 1158 (collecting cases). For instance, a plaintiff may rely on circumstantial evidence to show pretext, but such evidence "must be both specific and substantial.'" *Wieland v. Board of Regents of Nevada System of Higher Education*, No. 23-15339, 2024 WL 810445, at *1 (9th Cir. Feb. 27, 2024) (quoting *Villiarimo*, 281 F.3d at 1062) Also, "'[i]n judging whether [an employer's] proffered justifications [are] false, it is not important whether they were *objectively* false [because] courts only require that an employer honestly believed its reasons for its actions, even if its reason is foolish or trivial or even baseless.'" *Fried v. Wynn Las Vegas LLC*, No. 20-15710, 2021 WL 5408678, at *2 (9th Cir. Nov. 18, 2021) (quoting *Villiarimo*, 281 F.3d at 1063) (cleaned up) (emphasis in original). And "where abundant and uncontroverted independent evidence suggests that no discrimination occurred, plaintiff's creation of only a weak issue of fact as to whether the employer's reason was untrue will not suffice." *Opara*, 57 F.4th at 723 (citing *Reeves*, 530 U.S. at 148) (cleaned up).

### a)      *Decision to Investigate*

Delmore does not show evidence from which a jury could conclude that Flynn's legitimate, nondiscriminatory reasons for initiating an investigation into his actions on December 2 are pretext for discrimination. Delmore does not distinguish between direct and indirect evidence he offers to show Flynn's proffered justification was pretexual. *See* Dkt. 47 at 28; Dkt. 71 at 12–13. Delmore only argues that because "Flynn treated similarly situated white

employees differently in deciding who to investigate . . . this disparate treatment is evidence of pretext." Dkt. 47 at 28. As discussed above, Delmore does not show that his white Larch coworkers who were not investigated were "similarly situated" because they did not engage in comparable conduct. *See supra* Sec. IV.A.1.a. And because "a plaintiff's burden is much less at the prima facie stage than at the pretext stage," the circumstantial evidence of discrimination that Delmore has presented surrounding the investigation decision does not necessarily create a material issue of fact at the pretext stage. *See Hawn*, 615 F.3d at 1158; *see also Wieland*, 2024 WL 810445, at *1 ("[S]uch evidence must be both specific and substantial."). Delmore has not shown that Flynn's proffered explanation for investigating Delmore following "multiple pieces [of evidence]," Dkt. 40-1 at 27, was "internally inconsistent or otherwise not believable." *See Opara*, 57 F.4th at 723.

Although Delmore does not argue that the decision to investigate was pretextual based on direct evidence, "the 'shift' back to the plaintiff [in the *McDonnell Douglas* test] does not place a new burden of production on the plaintiff." *Noyes v. Kelly Service*, 488 F.3d 1163, 1169 (9th Cir. 2007) (citation omitted). Delmore has argued that Flynn's comments referring to Black employees as "colored" nearly five years after Delmore was investigated, and white employees as "regular" during her deposition almost seven years after the investigation decision are direct evidence of race discrimination. Dkt. 47 at 18–19; *see* Dkt. 48-1 at 60, 63; Dkt. 42 ¶ 25. Because these comments are "far removed" from the circumstances surrounding the decision to investigate, *Cordova*, 124 F.3d at 1149, Delmore cannot show that "unlawful discrimination more likely [than not] motivated the employer" at the pretext stage. *See Opara*, 57 F.4th at 723; *Hawn*, 615 F.3d at 1158. Nor can the combination of Delmore's limited circumstantial evidence and discriminatory comments "far removed" from the decision to investigate show pretext. *See Opara*, 57 F.4th at 723; *Cordova*, 124 F.3d at 1149. Accordingly, Delmore cannot overcome his

burden to show that Flynn's legitimate, nondiscriminatory reasons for initiating an investigation into his actions on December 2 were pretextual.

### b) Decision to Terminate

Delmore also cannot show that Flynn's legitimate, nondiscriminatory reasons for his termination are pretext for discrimination. Delmore again does not argue that Flynn's decision to terminate was pretextual based on direct evidence. *See* Dkt. 47 at 28–29; Dkt. 71 at 12–13. Because Delmore offers no new direct evidence or arguments of unlawful discrimination, the Court renews its conclusion above that Flynn's comments, when evaluated at the pretext stage, were "stray [and] unrelated to the decisional process." *Dominguez-Curry*, 424 F.3d at 1038; *see Cordova*, 124 F.3d at 1149.

Instead, Delmore attempts to prove pretext "indirectly, by showing that the employer's proffered explanation is unworthy of credence[.]" *Opara*, 57 F.4th at 723 (cleaned up); *see* Dkt. 47 at 28. Delmore first argues that he was treated differently than "Johnston, a white employee, . . . in her disciplinary decisions following their investigations." Dkt. 47 at 28. As the Court discussed above, Delmore does not show that Johnston was "similarly situated," given Johnston's rank three steps above Delmore, his differentiated supervisory responsibilities, and his admission of less severe violations of DOC policy. *See supra* Sec. IV.A.3.b.

Next, Delmore asserts that Flynn "issued her [termination] decision moments after the 600-page report was finalized" and "did not read the full report." Dkt. 47 at 28. This is not supported by the record. Five days after the investigative report was completed and two days after she received the "final case" copy, Flynn issued Delmore a pre-disciplinary letter. Dkt. 48-1 at 73; Dkt 72-1 at 145. While Flynn conceded in her deposition that she did not read "all 600 pages" of the report binder (the majority of which are exhibits), Delmore does not argue that Flynn did not read the primary report findings, which are referenced throughout her pre-

disciplinary and termination letters. Dkt. 48-1 at 61, 73–74.; *see generally* Dkt. 42-2; Dkt. 42-3. Most importantly, a pre-disciplinary letter is not a termination decision, and Delmore points to no evidence in the record that Defendants had determined they would fire Delmore when they issued the letter on May 10. *See* Dkt. 48-1 at 73 (Per Delmore's CBA, the pre-disciplinary letter included "an opportunity to respond to the allegations and to present any information" before Flynn's determination).

Delmore then argues that Flynn "conducted no follow-up on any of the many issues raised in the report." Dkt. 47 at 28. These issues include crediting "the stories of Offenders Lagesse and Osborn" over Delmore's consistent denials that he planted the shank and "her automatic belief in the testimony of . . . white employees, like CO Nick McKinney[.]" *Id.* at 26; Dkt. 71 at 12. Delmore contends that Lagesse, whose bunk the shank was found in, and Osborne, who helped coordinate the inmate letters that named Delmore as being involved in planting the shank, were childhood friends and "were known to be" drug dealers inside of Larch. Dkt. 71 at 7; Dkt. 47 at 10, 12; Dkt. 42-2 at 87. He argues that "[o]ffenders heavily involved in importing and dealing drugs inside the prison would have reason to have weapons and motive to accuse a CO of planting the weapon[.]" Dkt. 71 at 7. Delmore also asserts that McKinney's testimony was not credible because he did not report the interaction involving the hammer until almost two weeks after the it occurred, resigned near the time the shank was found, and did not get along with Delmore. Dkt. 47 at 17 n.12.

Flynn's termination letter, like the investigative report its findings are drawn from, is based on multiple accounts from Larch inmates, employees, and Delmore's own statements. Dkt. 42-3 at 5–8; *see also* Dkt. 42-2 at 3, 18–19 (DOC investigative report interviewed thirty-one witnesses, including Delmore several times). Flynn does not appear to credit Osborn's letter or statements in her termination decision. *See* Dkt. 42-3 at 5–8 (Osborn's statements not mentioned

as a basis for finding Delmore made and planted the shank). While the termination letter does mention Lagesse's denial that the shank was his, it notes Lagesse was also consistent in his denials in surveilled phone calls made to individuals outside of Larch around December 2. *See id.* at 7. And even viewing the evidence in the light most favorable to Delmore at summary judgment, he has not presented "specific and substantial" evidence of an alternative theory that he was set up. *See Wieland*, 2024 WL 810445, at *1 (quoting *Villiarimo*, 281 F.3d at 1062).

Delmore's reasons for discrediting McKinney's account are also not substantiated by the record. McKinney only submitted a report after a supervisor asked him to write up the interaction. Dkt. 42-2 at 316, 16. If the timing and context around McKinney's delayed incident reports imply anything, it is his reluctance to get involved in the investigation. *See id.* at 16, 316. Even though Delmore stated he and McKinney "did not get along," he also said that they "had a working relationship." *Id.* at 586; *see also* Dkt. 42-3 at 7 ("Even if you struggled to work professionally with Officer McKinney, I find it difficult to believe that you would not provide a response to such a benign question from him regarding your need for a hammer."). And as detailed in Flynn's termination letter, there was also an objective basis for doubting Delmore's version of events. *See, e.g.* Dkt. 42-2 at 589, 31–32 (Delmore initially denying that he spoke to Anderson a second time after the shank was found, but then admitting he had after the investigator mentioned two written reports by Larch employees that corroborated Anderson's narrative that he was on B-Tier); *Id.* at 582 (Delmore initially denying checking out a hammer from recreation, but when the investigator asked why his prints might be located on them, he responded, "I uh, the day of this thing. My belt was broken.").

But even if there was no objective basis for doubting Delmore's inconsistent version of events on December 2 and crediting multiple Larch employee and inmate accounts, "courts only require that an employer honestly believed its reasons for its actions, even if its reason is foolish

1  or trivial or even baseless." *Fried*, 2021 WL 5408678, at *2; *see also Bailey v. Olympia Union*

2  *Gospel Mission*, No. 3:23-cv-05337, 2024 WL 1701947, at *3 (W.D. Wash. Apr. 19, 2024)

3  (rejecting plaintiff's argument that a misidentification made in a fight involving the plaintiff,

4  which formed the basis of employer's termination decision, showed pretext because there was no

5  evidence employer believed its proffered explanation was false). The Court finds no genuine

6  factual question that Flynn did not "honestly believe[]" her reasons for terminating Delmore. *See*

7  *Fried*, 2021 WL 5408678, at *2; Dkt. 42-3 at 5–8.

8       Next, Delmore argues that Flynn "disregarded and destroyed affidavits in support of

9  Delmore rather than carefully reviewing them along with the other evidence" in her termination

10  decision. Dkt. 47 at 28. While the "letters from Delmore's Larch colleagues attesting to his

11  character, reputation, and work ethic" were not produced in discovery, Plaintiff offers no

12  evidence that Defendants "destroyed" them. *See* Dkt. 49 ¶ 5; Dkt. 55 ¶ 5. Although Flynn does

13  not recall receiving the letters, *see* Dkt. 72-1 at 5, their relevance does not make Flynn's

14  "proffered explanation [for Delmore's termination] unworthy of credence," Dkt. 47 at 28. The

15  letters commend Delmore's performance as an employee, but do not introduce evidence refuting

16  the allegations of his alleged misconduct on December 2 that formed the basis of his termination.

17  *See, e.g.* Dkt. 49 at 5 ("Julian [h]as proven he possesses both the leadership and team building

18  skills that are a must in his position as a Correctional Officer."); *id.* at 9 ("Julian takes pride in

19  training new staff" [and] . . . has a strong moral character."). Further, Defendants do not contest

20  that Delmore was performing satisfactorily before the December 2 incident, but instead maintain

21  that his alleged misconduct was too severe to warrant reinstatement. Dkt. 42-3 at 11 ("When

22  determining that this discipline was appropriate, I reviewed your previous work history, length of

23  service, and training provided [and] . . . found no prior discipline in your personnel file."); *see*

24

*also id.* at 12 ("It is inconceivable with this conduct alone that you could return to being a successful member of DOC.").

Finally, Delmore argues that Flynn "repeatedly disregarded chain of custody and evidence protocols." Dkt. 47 at 28. Delmore states that while the shank was turned over to Clark County for fingerprint processing shortly after December 2, the broken scissor handle was not turned over until 2020. Dkt. 71 at 8–9; Dkt. 72-1 at 137. Delmore argues that Flynn "shield[ed] the evidence from forensic comparison to the shank in question" and "cited it as evidence" against Delmore in her termination letter. Dkt. 71 at 9; Dkt. 42-3 at 6. Although Plaintiff is correct that Flynn did not turn over the scissor handle to Clark County until 2020, Flynn transferred the evidence to the DOC investigator during the internal investigation. Dkt. 72-1 at 137. Plaintiff is also correct that the handle, which was found outside the staff bathroom that McKinney saw Delmore walk into with the hammer, is cited as one piece of evidence in Flynn's termination letter. *See* Dkt. 42-3 at 6 ("A piece of those scissors was also later found just outside of the bathroom by Officer McKinney.").

But even at summary judgment, Delmore pointing to the scissor handle not being turned over to Clark County during a DOC investigation does not create an inference that Flynn's otherwise well-supported termination decision was pretextual. "[W]here abundant and uncontroverted independent evidence suggests that no discrimination occurred, plaintiff's creation of only a weak issue of fact as to whether the employer's reason was untrue will not suffice." *Opara*, 57 F.4th at 723 (citing *Reeves*, 530 U.S. at 148) (cleaned up). Here, Flynn's termination decision was grounded in a six-month DOC internal investigation that supported several of the serious allegations of misconduct against Delmore, including making and planting a shank in an inmate's bunk. *See* Dkt. 42-3 at 5–8; *see generally* Dkt. 42-2. Flynn's findings that Delmore's account was not "credible" based on "far too many conflicting statements" is

similarly supported by DOC's investigation. Dkt. 42-3 at 5; *see, e.g.,* Dkt. 42-2 at 19 ("Delmore was asked about when he had gone into the REC staff bathroom and had placed his belt on the floor. CO2 Delmore stated at the time that he had hung his belt up on a hook. When asked to clarify, CO2 Delmore stated, 'I didn't put my duty belt on the floor.'"). Also, to the extent Delmore implies that Flynn sent the shank for fingerprinting because she suspected Delmore's prints would be on it but did not send the scissor handle because she feared his prints would not be on it, the Court notes that Flynn's termination letter does not include any reference to fingerprint results from the shank. *See generally* Dkt. 42-3. Flynn's failure to send the scissor handle for fingerprint processing does not, on its own, make her explanation for terminating Delmore, "unworthy of credence." *Opara*, 57 F.4th at 723 (quoting *Chuang*, 225 F.3d at 1127). Accordingly, Delmore cannot show that Flynn's legitimate, nondiscriminatory reasons for his termination were pretextual.

Delmore has not shown "that, but for race, he would not have suffered the loss of a legally protected right" in either the investigation or termination decisions. *See Brown*, 823 F. App'x. at 480 (9th Cir. 2020) (quoting *Comcast Corp.*, 589 U.S. at 336 (2020)). Because Delmore cannot show that triable issues exist regarding pretext, summary judgment dismissing his Section 1981 and Section 1983 race discrimination claims is warranted.

**B.    Delmore cannot show Defendants retaliated against him in violation of Sections 1981 and 1983.**

Delmore claims that Defendants retaliated against him under color of law by disciplining and firing him for raising complaints of race discrimination. Dkt. 1 ¶ 57. Delmore also alleges that Flynn retaliated against him after he was terminated and filed a grievance with his union in which he complained of race discrimination. *Id.* ¶ 58. He claims that Flynn "initiat[ed] criminal charges against him upon the eve of his being reinstated" and "continu[ed] to cooperate in the

criminal proceedings against him." *Id.* Both parties move for summary judgment on Delmore's retaliation claim. Dkt. 39; Dkt. 71.

To establish retaliation under Section 1981, Delmore must meet the same requirements as a retaliation claim under Title VII. *Erwin v. OBI Seafoods, LLC*, No. 2:22-cv-00893-JHC, 2024 WL 1138905, at *15 (W.D. Wash. Mar. 15, 2024); *see also Manatt*, 339 F.3d at 797 ("[T]hose legal principles guiding a court in at Title VII dispute apply with equal force in a § 1981 action."). Like in the disparate treatment context, if Delmore establishes a prima facie case, the burden shifts to Flynn to advance a legitimate, nonretaliatory reason for any adverse employment action taken against Delmore. *Reynaga*, 847 F.3d at 693. If Flynn meets this burden, then Delmore "has the ultimate burden of showing that [Flynn's] proffered reasons are pretextual." *Id.* (internal quotation marks and citation omitted).

Delmore alleges three instances of retaliatory action, one before he was terminated and two afterwards: (1) Flynn terminated Delmore after he filed an EEOC charge; (2) Flynn interfered, and ultimately "halt[ed]" Delmore's union grievance process by "pushing Clark County to bring . . . criminal charges" against him; and (3) Flynn's continued involvement in Delmore's criminal proceedings after he participated in an online petition complaining of discrimination at Larch and calling for Flynn's ouster. Dkt. 47 at 31; Dkt. 71 at 13–16.

### 1.  *Prima facie case*

Delmore must establish that "(1) []he engaged in a protected activity; (2) []he suffered an adverse employment action; and (3) there was a causal relationship between the two." *Lui*, 129 F.4th at 782 (quoting *Surrell v. California Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008)). "[O]nly non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Reynaga*, 847 F.3d at 693 (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

<em>a)</em>      <strong><em>EEOC charge</em></strong>

Delmore has established the first element of his prima facie case. Filing an EEOC

complaint "constitute[s] protected activity for the purposes of § 1981." *Shahrivar v. City of San*

*Jose*, 752 F. App'x 415, 419 (9th Cir. 2018); *see also* 42 U.S.C. § 2000e-3(a) ("It shall be an

unlawful employment practice for an employer to discriminate against any of his employees . . .

because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter.").

Delmore appears to conflate which of Defendants' alleged adverse employment decisions

is the basis for his retaliation claim. He initially argues that "Delmore was terminated after

conducting an EEOC intake and filing an EEOC charge." Dkt. 47 at 31. As discussed in the

discrimination context and as Defendants have acknowledged, termination is "the ultimate

adverse employment action[.]" Dkt. 39 at 9. But in addressing the causation element of his prima

facie case, Delmore appears to argue that Flynn's pre-disciplinary letter is the adverse

employment action. *See* Dkt. 47 at 33 ("Flynn hastily decided to terminate Delmore on May 10

. . . less than six weeks after being notified on March 23 that Delmore had filed an EEOC

charge[.]"); Dkt. 71 at 13 ("But for Mr. Delmore's complaints of race discrimination in late

March 2017 (his EEOC charge), Flynn would not have issued a pre-disciplinary decision on May

10, 2017[.]"). Given Delmore's arguments, the Court must address whether Flynn's pre-

disciplinary letter is an adverse employment action.

Retaliation claims may be brought against a much broader range of employer conduct

than substantive claims of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548

U.S. 53, 67–68 (2006). "[A] Title VII retaliation claim need not be supported by an adverse

action that materially altered the terms or conditions of the plaintiff's employment; instead an

allegedly retaliatory action is subject to challenge so long as the plaintiff can show that 'a

reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Campbell*, 892 F.3d at 1021 (quoting *Burlington*, 548 U.S. at 68).

Under this standard, the pre-disciplinary letter is an adverse action. *See Burlington*, 548 U.S. at 67–68. The May 10 letter advised Delmore that DOC was "considering taking disciplinary action . . . up to and including discharge." Dkt. 48-1 at 73. The specter of disciplinary action, especially one that might lead to termination, "might have 'dissuaded a reasonable worker from making . . . a charge of discrimination.'" *Burlington*, 548 U.S. at 68; *see also Davis v. Port Angeles School District*, C20-5448-BHS-SKV, 2021 WL 8086629, at *18 (W.D. Wash. Oct. 1, 2021) (finding that employer's referral of employee's alleged misconduct to ethics board is an adverse employment action "because the threat . . . which could lead to professional discipline . . . is reasonably likely to deter an employee from engaging in protected activity."). Delmore has met his burden on the second element in either the termination decision itself or the pre-disciplinary letter.

Causation is a closer call. Title VII retaliation claims "must be proved according to traditional principles of but-for causation[.]" *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). "The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011). "The Ninth Circuit has recognized that in some cases, 'causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity.'" *Knight v. Brown*, 797 F. Supp. 2d at 1134 (quoting *Villiarimo*, 281 F.3d at 1064–65). But the Ninth Circuit has limited an inference of retaliation solely based on timing to adverse actions that have

"occurred fairly soon after the employee's protected expression." *Villiarimo*, 281 F.3d at 1065 (citation omitted).

Delmore relies solely on timing to show retaliatory motive. Dkt. 47 at 22–23; Dkt. 71 at 13. On March 15, Delmore filed a formal EEOC charge alleging discrimination, which DOC received on March 23. Dkt. 48-1 at 209, 130. The Ninth Circuit has held that "adverse employment actions which occurred between two and three months after protected activity were sufficient to establish at least a prima facie case of causation." *Shahrivar*, 752 F. App'x at 419 (collecting cases); *cf. Villiarimo*, 281 F.3d at 1065 (citing Seventh Circuit, Tenth Circuit, and Supreme Court cases that held that four months, five months, and eight months, standing alone, were too long to support inference of causation). Although Delmore was terminated nearly six months after he filed the EEOC charge, there was less than two months between the EEOC charge and the pre-disciplinary letter. *See* Dkt. 48-1 at 73, 209; Dkt. 42-3 at 3; *see also* 42 U.S.C. § 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has made a charge[.]"). At least as it relates to the pre-disciplinary letter, Delmore has met his prima facie burden.

### b)      *Interference with union grievance process*

Delmore cannot meet his prima facie burden to show retaliation based on Flynn's alleged interference with his post-termination union grievance process. *See* Dkt. 71 at 15. "An employee engages in protected activity when []he opposes an employment practice that either violates Title VII or that the employee reasonably believes violates that law." *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013); *see also* 42 U.S.C. § 2000e-3(a). Delmore argues that he and his union "filed Step 1 and Step 2 grievances complaining of race discrimination[.]" Dkt. 71 at 15. The record, however, shows only that Delmore's union representative alleged his termination was a violation of the CBA "including but not limited to

the Just Cause provision in Article 8." *See* Dkt. 48-1 at 112–13, 118–19; *see also* Dkt. 49 ¶ 7 ("I represented Mr. Delmore in his Step 1 grievance . . . . The goal of the grievance was, among other things, to get Mr. Delmore reinstated."). The record does not show that the union grievance alleged race discrimination.

Delmore cites to only one case, *Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 850 (9th Cir. 2004), to argue that union grievances constitute a protected activity in the retaliation context. Dkt. 47 at 30. In *Pardi*, an employee initiated several grievances through his union and filed charges with the EEOC alleging his employer failed to accommodate his disability. 389 F.3d at 844. The court held that "[p]ursuing one's rights under the ADA constitutes a protected activity," explaining that Pardi "lodged numerous union grievances . . . regarding Kaiser's failure to accommodate his disability." *Id.* at 850. Unlike in *Pardi*, Delmore did not use the union grievance process to allege discrimination, but rather to dispute the facts supporting his termination under the just cause terms of the CBA. *See* Dkt. 48-1 at 112–13. And courts within the Ninth Circuit have held that union activity standing alone is not within the scope of Title VII's protected activity. *Cloud v. Brennan*, 436 F. Supp. 3d 1290, 1298 (N.D. Cal. Feb. 3, 2020) (collecting cases); *Velarde v. DeJoy*, No. 3:23-cv-06008-DGE, 2024 WL 2399983, at *4 (W.D. Wash. May 23, 2024) (finding that plaintiff's union activity, including her filing of several grievances, "cannot form the basis of a retaliation claim.").

Even if the Court accepted that Delmore's concurrent EEOC charge infused his union grievance as one in opposition to an "employment practice that . . . [he] reasonably believes violates [Title VII]," *Westendorf*, 712 F.3d at 422, he still does not meet his prima facie burden. The Court agrees with Delmore that, under the broad adverse employment action standard in retaliation cases, DOC's decision to place Delmore's post-termination grievance on hold pending resolution of his criminal case "might have dissuaded a reasonable worker from making or

supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (citation omitted); *see*
Dkt. 72-1 at 191, 193–94, 197–98.

But Delmore cannot establish the third element of his prima facie case, causation. He
argues that Flynn "urged Clark County to bring criminal charges for the stated purpose of halting
his grievance and reinstatement" and "admitted her adverse action was because of his protected
activity." Dkt. 71 at 15. Defendants respond that Delmore has not presented evidence that "Clark
County would not have decided to arrest and charge Mr. Delmore but for an alleged retaliatory
motive of Ms. Flynn or DOC." Dkt. 77 at 3. The Court agrees with Defendants.

The Court first notes that Delmore does not show direct evidence of causation. "To
establish a causal connection between her protected activity and the adverse actions, a plaintiff
may allege direct or circumstantial evidence from which causation can be inferred[.]" *Cloud*, 436
F. Supp. 3d at 1301 (citing *Porter v. Cal. Dep't Corr.*, 419 F.3d 885, 895 (9th Cir. 2005)).
Despite Delmore's assertion to the contrary, there is no direct evidence of Flynn "urg[ing] Clark
County to bring criminal charges" or that her "stated purpose" was "halting his grievance and
reinstatement." Dkt. 71 at 15. The emails Delmore cites to largely involve Flynn checking on the
status of the criminal investigation. *See, e.g.,* Dkt. 48-1 at 152; Dkt. 72-1 at 159–60, 175–76.

There are two exceptions to the status update emails. On August 21, 2017, prior to
Delmore's termination, Flynn asked Sergeant Hoss at the Clark County Sheriff's Office for a
statement on the discovery of fingerprints on the shank. Dkt. 68-1 at 21. When Hoss indicated
that releasing a statement could impact the criminal investigation, Flynn wrote back that she did
"NOT want to jeopardize this case in any way[.]" *Id.* Then on December 19, after Delmore had
requested a PARM, Flynn requested another update on the criminal investigation and wrote that
DOC is "pushing up against actions with this terminated employee[.]" Dkt. 72-1 at 165. Flynn's
request for updates on Delmore's criminal investigation, her statement about not wanting to

jeopardize the criminal case, and her comment that she was "pushing up against actions" with Delmore's grievance process are not direct evidence of retaliatory intent—*i.e.*, that Flynn was pushing for criminal charges *because of* Delmore's union activity. *See Cloud*, 436 F. Supp. 3d at 1301.

Delmore can still prove causation through "circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action." *Dawson*, 630 F.3d at 936. Delmore details a timeline of events showing Flynn's knowledge of his post-termination grievance activities, her communications with Clark County and Clark County's eventual decision to criminally charge him, and DOC's indefinite hold on scheduling the PARM. *See* Dkt. 71 at 9–10. Absent from this timeline, though, are the instances that undercut Delmore's circumstantial evidence of retaliatory intent. Flynn first involved Clark County at the outset of DOC's internal investigation in December 2016, nine months before Delmore initiated the grievance process and more than three months before he filed his EEOC charge. Dkt 68-1 at 3–4; Dkt. 72-1 at 153; Dkt. 40-1 at 41; Dkt. 48-1 at 111, 209. Hoss also appears to have reached out to Flynn first to discuss Delmore's criminal investigation in mid-July 2017, including an agreement that DOC would "turn over documents from [its] investigation." Dkt. 72-1 at 152–53, 156.

But even focusing on the period of Flynn's increased communications with Clark County around Delmore's grievance activities, Delmore cannot show that but for his participation in the post-termination process, his grievance and potential reinstatement would not have been put on hold. As discussed above, Title VII retaliation claims "must be proved according to traditional principles of but-for causation[.]" *Nassar*, 570 U.S. at 360. As the Supreme Court explained further in *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 656 (2020), "a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-

for cause." *Id.* Delmore directs the Court to presume that were he not engaged in a protected

activity (filing a post-termination grievance), the outcome (his pre-mediation meeting put on

hold) would have changed. *See id.* This is a bridge too far. Apart from the circularity of his

argument, Plaintiff's own statements and the record evidence belie this conclusion and instead

show that Delmore's arrest was the "but-for" cause. *See* Dkt. 71 at 15 ("Mr. Delmore was

arrested on January 3, and DOC immediately halted the grievance process); Dkt. 47 at 19

("Demore's arrest brought his grievance and request for reinstatement to a halt."); Dkt. 72-1 at

191 ("[T]he grievance is on hold until the court results come in."). Although "events [can] have

multiple but-for causes," Delmore has not shown a genuine factual dispute that his union

grievance was the "but-for" cause of his post-termination process being put on hold. *See Bostock*,

590 U.S. at 656.

Nor has Delmore alleged or pointed to evidence that Flynn's alleged retaliatory motive

infected Clark County's charging decision and arrest. "A plaintiff may use a 'cat's paw' theory

of liability for causation 'when they cannot show that the decisionmaker—the person who took

the adverse employment action—harbored any retaliatory animus.'" *Edgell v. Regan*, No. 2:22-

cv-00045-JHC, 2023 WL 8702058, at *8 (W.D. Wash. Dec. 15, 2023) (quoting *Acosta v. Brain*,

910 F.3d 502, 514–15 (9th Cir. 2018)). To do so, "a plaintiff must establish that the person with

a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action."

*Acosta*, 910 F.3d at 514–15. First, Delmore does not allege a "cat's paw" theory in any of his

pleadings. *See generally* Dkt. 1; Dkt. 47; Dkt. 71. But even if he had, Delmore does not show

that Flynn "somehow influenced" Neiman, the arresting officer, Hoss, or Clark County.

Evaluating the facts in the light most favorable to Delmore, Flynn's December 19 email to Hoss

that DOC was "pushing up against actions with this terminated employee," sped up Clark

County's charging decision. Dkt. 72-1 at 165 ("I have moved it up. Detective Neiman has it on

his desk now."). Delmore stresses the timing of this exchange because "DOC was "required to schedule [Delmore's] PARM within 14 days of receipt." Dkt. 71 at 10. But according to the CBA, the 14-day window allowed DOC to either (1) schedule the PARM, or (2) "[n]otify the [u]nion . . . that no [PARM] will be scheduled." Dkt. 72-1 at 176. And in any case, Detective Neiman's charging decision occurred outside of the 14-day PARM window, roughly three weeks later. *See* Dkt. 68-1 at 23.

More importantly, Delmore presents no evidence that Clark County did not make an independent decision to arrest Delmore. As detailed in his probable cause statement, Neiman arrested Delmore for two felonies after reviewing the DOC investigation and fingerprint analysis of the shank. Dkt. *Id.* at 23–27; 29–31. Because Delmore has not established a causal link between his grievance activities and his post-termination process being placed on hold, he cannot establish a prima facie case for this action.

### c)    Ongoing participation in Delmore's criminal case

Delmore also cannot establish a prima facie case of retaliation for Flynn's alleged ongoing involvement in his criminal case. Delmore argues that the triggering event for Flynn's post-termination adverse actions was his "participati[on] and signing [of] a Change.[o]rg petition complaining of Flynn's race discrimination" in April 2018. Dkt. 47 at 30; Dkt. 48-1 at 76. "[A]n employee's complaints about the treatment of others is considered a protected activity, even if the employee is not a member of the class that he claims suffered from discrimination, and even if the discrimination he complained about was not legally cognizable." *Edgell*, 2023 WL 8702058, at *14 (quoting *Ray*, 217 F.3d at 1240 n.3). Delmore signing and advocating for an online petition complaining of race discrimination is clearly a protected activity. *See id.*

Delmore next alleges multiple adverse employment actions stemming from this protected activity: (1) his grievance process being put on hold, Dkt. 47 at 31; (2) Flynn's creation of a new

incident report about the events of December 2, *id.* at 20–21; and (3) Flynn's violation of Delmore's constitutional *Garrity* rights, Dkt. 71 at 11–12, 14.

As discussed above, DOC placing Delmore's post-termination grievance process on hold is an adverse employment action. *See supra* Sec. IV.B.1.b. But Delmore once again cannot establish causation. Specifically, Delmore cannot show that but for his protected activity, he would not have suffered the adverse action since his PARM was put on hold before the petition was even created. *See Nassar*, 570 U.S. at 360; Dkt. 72-1 at 188; *see also Petition to Remove the Superintendent of Larch Corrections Center*, Change.org (Feb 24. 2018), https://www.change.org/p/steven-sinclair-secretary-wa-state-department-of-corrections-a-petition-to-remove-the-superintendent-of-larch-corrections-center-prison. To the extent that Delmore argues that his participation caused his grievance process to remain on hold, *see* Dkt. 47 at 31, he has pointed to no evidence in the record that Defendants were even aware he signed or advocated for the petition. *See Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) (To establish causation indirectly, "the plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity.").

Delmore has also not shown that Flynn's creation of a new incident report is an adverse employment action. The creation of an incident report, which recounts the events on December 2 that led to DOC's investigation and the subsequent criminal investigation, is not an adverse employment action even under the more forgiving retaliation standard. Dkt. 48-1 at 148; *see Reynaga*, 847 F.3d at 693 ("[O]nly non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation."). Even if it were an adverse action, Delmore cannot show causation because there is no evidence Defendants were aware of his public advocacy. *See Raad*, 323 F.3d at 1197.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE DEFENSES - 50

Finally, Flynn's alleged sharing of Delmore's unredacted interview statements with Clark County also fails at the prima facie stage. Delmore claims that "[b]ut for Mr. Delmore's pending grievance and role in public petitions and protests . . . Flynn would not have been so invested in the criminal proceedings against Mr. Delmore that she would violate his constitutional *Garrity* rights." Dkt. 71 at 14. Although Detective Neiman initially requested Delmore's statements from Flynn on behalf of the prosecutor in October 2019, there is no evidence that Flynn provided the statements to Clark County directly. *See* Dkt. 72-1 at 214; *see also id.* at 207 ("I have concerns about this because of *Garrity*. Please advise.") (italics added). Neiman eventually made a public records request in November 2019 and received the unredacted statements from the Washington State Attorney General's office four months later, in accordance with DOC policy for releasing information. *Id.* at 214; *see also* 68-1 at 40. Even if the Court were to construe release of Delmore's unredacted statements following a public records request as an adverse employment action, the claim fails again at the causation element. As discussed, there is no evidence that Defendants were aware of Delmore participating in the online petition. *See Raad*, 323 F.3d at 1197. Finally, whether using Delmore's advocacy of the petition in April 2018, the petition's creation in February 2018, or his grievance in September 2017 as the triggering protected activity, the release of his statements happened at least a year and a half later, and thus does not "follow on the heels" of his protected activity. *See Villiarimo*, 281 F.3d at 1065; *Shahrivar*, 752 F. App'x at 419. Accordingly, this retaliation claim also fails at the prima facie stage.

2. *Legitimate, nonretaliatory reasons*

Delmore has only shown a prima facie retaliation case related to his EEOC complaint, so the Court analyzes this claim through steps two and three of the *McDonnell Douglas* framework. Because Delmore has established a prima facie case for retaliation, "the burden shifts to

1
2

[Defendants] to produce evidence showing that the challenged actions were done for non-retaliatory purposes." *Campbell*, 892 F.3d at 1022.

3

4

5

6

7

8

9

10

11

12

13

    Based on the evidence in the record, Defendants have established legitimate, nonretaliatory reasons for issuing Delmore a pre-disciplinary letter on May 10. Under the "Evidence" section of the letter, Flynn wrote that, "Christy Kuna, Investigator 3, completed a fair and thorough investigation into this matter." Dkt. 48-1 at 74. The letter listed the allegations that "if true may be the basis for taking disciplinary action" against Delmore and attached a copy of the DOC report "describ[ing] these charges in detail." *Id.* at 73–74. Defendants have met their burden of supplying neutral, non-retaliatory reasons for the adverse employment action. *See Campbell*, 892 F.3d at 1022 (concluding public employer met its step two burden to investigate a teacher accused of misconduct because the agency "is permitted—indeed, required—to investigate when it receives credible allegations of teacher misconduct and in particular to ensure the wellbeing of its students.").

14

    3.    Pretext

15

16

17

18

19

20

21

22

    Delmore has not carried his burden to show that Defendants' justification for issuing a pre-disciplinary letter was pretextual. Once Defendants show their action was supported by neutral reasons, "the burden then shifts back to [Delmore] to point to evidence that may show [Defendants'] asserted rationale to be mere pretext." *See id; see also Dawson*, 630 F.3d at 936 (analyzing retaliation and disparate impact claims under the same burden-shifting standard). Delmore can do so either "directly by persuading the court that a retaliatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Campbell*, 892 F.3d at 1022. (cleaned up) (citation omitted).

23

24

    When "the plaintiff proffers only circumstantial evidence that the employer's motives were different from its stated motives, the court requires specific and substantial evidence of

1    pretext to survive summary judgment." *Edgell*, 2023 WL 8702058, at *10 (cleaned up) (citation

2    omitted); *see also Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d

3    1136, 1142 (9th Cir. 2001).

4           One type of circumstantial evidence is temporal proximity. As discussed above, temporal

5    proximity between a plaintiff's protected activity and the employer's adverse action can be

6    sufficient evidence that the employer's action was pretextual. *See Knight*, 797 F. Supp. 2d at

7    1135 (first citing *Dawson* 630 F.3d at 936; then citing *Bell v. Clackamas Cnty.*, 341 F.3d 858,

8    862–864, 866 (9th Cir. 2003)). But since the Supreme Court's decision in *Nassar*, the Ninth

9    Circuit has expressed some skepticism that temporal proximity alone can establish a genuine

10   dispute of material fact, especially at the pretext stage. *See, e.g., Kwesele v. King Cnty.*, No.

11   2:17-CV-1426-RAJ, 2019 WL 266450, at *13 (W.D. Wash. Jan. 18, 2019), *aff'd*, 804 F. App'x

12   726 (9th Cir. 2020) ("Plaintiff's temporal proximity argument is not, by itself, sufficient to show

13   pretext, as it is not accompanied by supporting evidence[.]"); *Serlin v. Alexander Dawson Sch.,*

14   *LLC*, 656 F. App'x 853, 855–56 (9th Cir. 2016) (holding that the "mere fact that [Plaintiff] made

15   her complaint three months prior to [Defendant's] decision not to renew her contract is

16   insufficient evidence of causation [or] . . . pretext[]."); *see also Hawn*, 615 F.3d at 1158 ("[A]

17   plaintiff's burden is much less at the prima facie stage than at the pretext stage."). Evidence of

18   temporal proximity is also less persuasive if there is an independent basis for the employer's

19   adverse action. *See Curley v. City of North Las Vegas*, 772 F.3d 629, 633–34 (9th Cir. 2014)

20   (holding plaintiff could not show pretext when he was terminated within two months of filing an

21   EEOC claim because an internal investigation found "several . . . independently sufficient bases

22   for firing him.").

23          Delmore argues that but for his EEOC charge, "Flynn would not have issued a pre-

24   disciplinary decision on May 10, 2017[.]" Dkt. 71 at 13; *see also* Dkt. 47 at 33 ("Flynn hastily

decided to terminate Delmore on May 10 following the conclusion of the investigation, less than six weeks after being notified on March 23 that Delmore had filed an EEOC charge against her."). Delmore also alleges two other actions by Flynn surrounding his EEOC complaint: (1) Flynn "discard[ing]" the character statements submitted during the pre-disciplinary hearing on May 24; and (2) Flynn "pressuring Clark County in August and September 2017 to criminally charge" Delmore "after they declined to do so initially." Dkt. 71 at 13–14.

Delmore's temporal proximity argument, without supporting evidence that Flynn's proffered explanation is unworthy of credence, "is not, by itself, sufficient to show pretext[.]" *See Kwesele*, 2019 WL 266450, at *13. Even if Flynn disregarded the character statements, evidence of good performance does not "challenge the credibility" of Defendants' adverse action when the proffered reasons are independent of past performance. *See Edgell*, 2023 WL 8702058, at *12. In *Edgell*, the court rejected plaintiff's argument that his evidence of good performance, including supportive statements from supervisors and peer employees, showed that his suspension was pretextual. *Id.* The court noted that because the employer's proffered reasons for the adverse action—an unprofessional email about an explosive device in a federal building and specific disparaging statements to certain staff members—did "not state that plaintiff was a generally bad employee . . . the evidence of good performance does not 'challenge the credibility'" of the employer. *Id.* Similarly here, Flynn's pre-disciplinary letter outlines specific and serious allegations about Delmore's actions on December 2, including making and planting a weapon in an inmate's bunk. Dkt. 48-1 at 73. Because Defendants do not dispute that Delmore performed satisfactorily before this incident, evidence that Defendants did not consider his past good performance does not create a reasonable inference of pretext. *See Edgell*, 2023 WL 8702058, at *12; Dkt. 42-3 at 11.

1       Delmore also asks the Court to infer that his pre-disciplinary letter was pretextual

2 because Flynn "pressur[ed] Clark County in August and September 2017 to criminally charge"

3 Delmore. Dkt. 71 at 14. Delmore also implies a new temporal proximity argument, pointing out

4 that one of Flynn's emails to Hoss on August 21, 2017 about not jeopardizing the criminal

5 investigation came three days after DOC responded to Delmore's EEOC charge. *See id.* at 10;

6 Dkt. 68-1 at 21. As discussed above, the record does not support Delmore's characterization that

7 Flynn "pressure[ed]" Clark County to criminally charge Delmore, especially where it appears

8 Hoss initiated the conversation in July about the pending criminal case. *See supra* Sec. IV.B.1.b;

9 Dkt. 72-1 at 152–53.

10      Delmore has not carried his burden to show that Flynn and DOC's reasons for sending

11 Delmore a pre-disciplinary letter were pretextual, and therefore, has failed to raise a triable issue

12 on his retaliation claims.

13      Finally, the Court briefly addresses Delmore's motion to dismiss DOC's defenses of lack

14 of subject matter jurisdiction and Eleventh Amendment immunity or in the alternative, motion

15 for leave to amend its complaint. Dkt. 83. Because the Court grants Defendants' summary

16 judgment motion dismissing Delmore's disparate treatment and retaliation claims on the merits,

17 Delmore's motion to dismiss DOC's alternate bases for summary judgment is moot. Similarly,

18 the Court denies Delmore's request for leave to amend as futile. *See Wheeler v. City of Santa*

19 *Clara*, 894 F.3d 1046, 1059 (9th Cir. 2018).

## V.    CONCLUSION

20      The Court GRANTS Defendants Washington State Department of Corrections ("DOC")

21 and Lisa Flynn's motion for summary judgment (Dkt. 39) and DISMISSES Plaintiff Julian

22 Delmore's claims with prejudice. Delmore's cross-motion for partial summary judgment

(Dkt. 71) is DENIED as moot. Delmore's motion to dismiss DOC's defenses or in the alternative, motion for leave to amend his complaint (Dkt. 83) is also DENIED as moot.

Dated this 28th day of March, 2025.

Tiffany M. Cartwright
United States District Judge

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE DEFENSES - 56